Good morning. All right. Morning, Mr. Walsh, Ms. Stacy. All right. We call the second case for the morning, 20-50356, Dr. Melvin G. Perry, Jr. v. VHS, San Antonio Partners, DBA, North Central Baptist. Mr. Walsh, you're up for your initial argument. Thank you, Your Honor. May it please the Court. My name is Colin Walsh, and I represent Dr. Perry, and I'm here to support this appeal. Summary judgment should be reversed for three reasons. First, under Fifth Circuit precedent, VHS has an employment relationship with Dr. Perry. Second, even if there was no employment relationship, VHS would still be liable to Dr. Perry under Title VII through the doctrine of Sibley Standard. And third, VHS is liable to Dr. Perry under Section 1981 because Dr. Perry has both a contractual relationship with VHS and because VHS interfered in Dr. Perry's contractual relationship with HICS. First, I'm going to talk about Title VII, and then I will discuss Section 1981. Title VII prohibits race and sex discrimination by employers against individuals. It also prohibits retaliation by employers against employees. There are three ways in which VHS is liable to Dr. Perry under Title VII. First is under the joint employer theory. The second is the single integrated enterprise theory. And the third is the doctrine of Sibley Standard. But all three can basically be boiled down to whether or not VHS can control Dr. Perry's work. And under this Court's decision in Burton v. Freescale Semiconductor, the issue of control boils down further to whether or not the entity can hire or fire, has the right to supervise, and has the right or ability to set the individual's schedule. In Burton v. Freescale Semiconductor, this Court further stated that the right to demand termination... The way I see the facts in this case regarding the employment relationship is that there is no authority that VSH has over Dr. Perry with respect to the hours he works, with respect to the kind of work he does, with respect to supervising his work, with respect to setting his hours. The only authority that they have is to terminate him. And if you have only one element of an employment relationship, employee relationship, uh, tell me why that is so powerful as to, uh, uh, to accommodate, uh, the absence of any other employee indicia. Well, Your Honor, uh, I would push back on, uh, what you said a little bit in terms of saying that they did have the right to supervise Dr. Perry. And if you look at our initial brief in our reply brief, we listed... And I've looked at it. You tell me why, what, how did they supervise him? Well, Your Honor, if you look at record page 1259, this was the statement of position that VHS submitted to the EEOC. It states that VHS both coached Dr. Perry on the job while he worked there and attempted to correct his behavior. That is what supervisors do. And that is what happened in Burnaby Freescale Semiconductor. Tell me, are there any instances, is there any evidence of that? Now, what, how did they coach him? What did they mean by coaching? Is the record reflect, uh, any further facts on that? Well, Your Honor, I would refer you again to 1259, the statement of position authored by VHS saying that they coached him and attempted to correct his behavior. And what that means is that they wanted him to do things differently. Who is defining what coach means? That's what I'm trying... Did they coach him in terms of how to conduct himself in the hospital and pursue it to their agreement to allow the I mean... Yes, Your Honor, that's exactly what they... Did it tell him how to do his job? They didn't tell him how to be a doctor, but they did tell him how to behave in the hospital and how to interact with other employees. Uh, and I would also suggest that, um, opposing counsel might be able to better answer what they meant by coach, since that is the word that VHS used. It told the, uh, EEOC how they handled Dr. Perry. I would also direct this court to record page 1035, which is Dr. Perry's testimony in which he says that, uh, VHS investigated complaints against Dr. Perry about how he was behaving and conducting himself in the, uh, hospital, and also said that if they received more complaints against him, they would terminate him. They also provided the equipment and facilities that Dr. Perry used to perform his job, and you see that on record page 1221. There's even more incidents of the, of how, um, VHS supervised and controlled Dr. Perry. Like I said, if you look at our brief pages 29 through 32, we have bullet points. If you look at our reply brief pages one through nine, we also have bullet points of all the various ways that Dr. Perry was controlled and supervised by VHS. But the right to demand termination was the most important factor. As this court stated in that case, most fundamentally, it was Freescale that decided and insisted that Burton be fired. Burton has offered adequate evidence of an employment relationship. And here, there's simply no question that VHS- My question to you is, if I am unconvinced by your arguments that they exercised any further power over him in terms of the performance of his job and the conditions of his employment and the times that he was worked and interfered with any control over him, assuming I'm unconvinced by your argument, but I am convinced by your argument and by the fair fact that they had the authority to terminate him, um, what, uh, on what basis could I hold that he is an emplo- an employee of VHS simply on the basis that they can terminate? What- Your Honor- I think that- I think that if you lost the case- Your Honor, I would say under Burton v. Freescale Semiconductor, the most fundamental question is whether or not they had the right to decide and insist on termination. And here- Okay, but I'm asking you for your reasoning. What- Is that- Am I- Oh, I'm sorry. Are you saying- Are you saying that that is sufficient to determine that they had an employee-employer relationship, the mere fact that they could terminate him? I would say that under Burton v. Freescale Semiconductor, that could be sufficient. I would say that we have more evidence, uh, as well, including the fact that VHS could and did require him to treat certain patients and that VHS could and did prohibit him from treating certain patients as well as could and did require him to be present in the hospital at certain times as well as set his sedation schedule, which is all additional evidence of supervision and control and is the three different elements this court found in Burton v. Freescale. But again, as- as Your Honor has acknowledged, the most fundamental one is the right to terminate or demand termination, which is undisputed that they had the ability and did exercise that ability with regard to Dr. Perry. But the other issue I would say, Your Honor, is that even if there is not an employment relationship under the doctrine of Sibley standing, VHS is still liable to Dr. Perry under Title VII. Now, Sibley standing has three different elements. The first- Has that ever been- Has Sibley ever been adopted by the Fifth Circuit? It has not been expressly adopted nor has it been rejected by the Fifth Circuit. Okay. And- And what did- what did you say to the district court about Sibley standing? Well, Your Honor, we argued each of the elements of Sibley standing and the court evaluated and ruled on each element and we made the essential argument that Title VII applies to VHS as it relates to Dr. Perry's claims. And under the Fifth Circuit precedent- I'm sorry, Your Honor. What do you mean by element? Well, so there's three elements to Sibley standing. The first is whether or not the defendant is an employer under Title VII. The second is whether there was some sort of employment relationship between the plaintiff and a third party, in this case, PICS. And the final element is whether the defendant interfered with access to the plaintiff's employment opportunities. And we presented each of those elements to the district court and the district court did in fact rule on each of those elements. And there is evidence- By way of saying- You argued each of those propositions by way of arguing that VHS was in fact the employer. Yes, Your Honor. We didn't use the term Sibley standing, but we did make the argument that all of the elements of Sibley standing are there. And under Fifth Circuit precedent, a plaintiff doesn't have to use the same legal terms, the legal authority, or the same words or labels in arguing to the district court. The issue is whether or not it was presented to the district court and whether or not it was sufficient to prevent the district court to rule on the I realize it's contested, but let's just assume because I want to hear the merits of it. Help me understand the way you're parsing textually 2000E2 subsection A. Yes, Your Honor. So if you look at that subsection, subsection A1, what it prohibits is employers from discriminating against any individual. It doesn't use the word employees there. And so what that means and what courts across the country have interpreted that to mean is that individuals means more than just employees or applicants for employees. And the evidence for that is actually pretty strong. If you even look at subsection A2, which uses the word employees and applicants for employees. Therefore, under standard statutory, I'm sorry, why? No, I appreciate the explanation. Why does the term any individual, let's just assume you're right, that's broader in A1 than it is in A2. Why doesn't that just simply mean that it also applies to former employees? That is, people who have been discharged, as the text of A1 says? Well, because it doesn't say that. I mean, we have clarity in the other sections of Title VII. It does say that. It says discharge any individual, right? Whereas A2 doesn't apply to discharged anybody. A2 applies to people who have been limited, segregated, or classified. So there's a very obvious textual distinction between them. It has nothing to do with individual or employee. It has everything to do with the verbs. That is, you fail to or refuse to hire or discharge any individual, which is not simply employees or applicants for employment. It's also former employees. Well, Your Honor, I would then direct you to the next clause in that section, which says, or otherwise discriminate against any individual with respect to his terms, compensation, conditions, or privileges of employment because of such individuals, race, color, religion, or national origin. Again, that doesn't have to do with or even the current state of employment. What it has to do with is discrimination in somebody else's, in an individual's employment, in their hiring, in their discharge. That's interesting. So then, but what do we do? That's an interesting distinction. But what do we do with the umbrella clause? And I don't know if that's a widely used phrase, but when I say umbrella, what I mean is the stuff that comes before the enumerated subsections. So it shall be an unlawful employment practice for an employer MDASH. That I think is, I call that the umbrella clause, which applies obviously to A1 and A2 and seems to pretty clearly limit it to the employment practices of the employer, right? So that would be VHS's employment practices in your case. Right. And so that's where the first element of simply standing comes in and why it's so important is that the employer at issue be a Title VII employer. So to use our example, PICS would not be subject to simply standing because they don't have 15 employees. So they're not a Title VII employer. So that weeds that out. But the fact that- But isn't this all just, if that's true, this all collapses back into whether VHS was Dr. Perry's employer? Well, no. What it collapses into is whether VHS is a Title VII employer interfered in his employment opportunities with another third party, in this case, PICS. But of course that wouldn't be an employment practice of VHS vis-a-vis Dr. Perry. Well, it would be an employment practice of an employer under Title VII to interfere with an individual's employment relationship with a third party. I don't- Well, let me put it this way. I don't understand how it would be, maybe this is a better way of asking the question. I apologize if I was unclear the first time. Let's say the an employer in the umbrella clause, that's VHS. It has to be an employment practice of VHS, to be actionable under A. That's what the umbrella clause says. And by definition, the only employment practices that VHS can have are vis-a-vis its employees. Right? I would disagree with that, Your Honor. I would say that they could have an employment practice towards independent contractors, towards clients, towards individuals. If VHS were to say, we will not work with any other companies or physicians groups that hire African-American doctors, that would be an employment practice of a Title VII employer like VHS. And so an employment practice doesn't necessarily include employees of that employer. It includes employment practices generally. Like for example, Section 1981 covers employment practices, but does expressly cover both employees and independent contractors to prohibit race discrimination in those kinds of practices. If they have a policy of never working with other groups that hire certain people, I would say that's an employment practice of an employer. Well, it would certainly be a refusal to hire, I'm sorry, to fail or to refuse to hire someone to work for them. And I guess my question is, what would be the best citation for the proposition that an employment practice of an employer, again, I'm focusing on the umbrella clause, it involves non-employment practices. That is things not involving the own employer's employees. Well, Your Honor, I would direct the court's attention to the Supreme Court of Texas ruling in NME Hospitals v. Reynolds, which in 1999 is when the Texas Supreme Court unanimously adopted a sibling standing as the correct interpretation or as the interpretation of Title VII. And in that case, they go through the case law, they go through the statute very carefully, and they determine that because of the way the statute's phrased, because of the words used and the difference between employee and individual, they come up with the three elements that I've outlined before, and the VHS meets in this particular case. And this isn't a fringe idea. When the Supreme Court adopted sibling standing in 1999, Justice Priscilla Owens- That was Texas Supreme Court. Yeah, I'm sorry, Your Honor, the Texas Supreme Court. But Justice Priscilla Owens was on that court. Governor Greg Abbott was on that court. Chief Justice of the Texas Supreme Court, Nathan Hecht, former Attorney General Alberto Gonzalez was also on that court. And it's because all these courts like the 11th Circuit, the Sixth Circuit, and the Western District of Texas, the Eastern District of Texas, the Eastern District of Louisiana, have all evaluated the language used in Title VII and the fact that they use individual instead of employee when Congress uses the word employee and applicant for employee in other statutes. And so I would just direct this court to look at the Reynolds decision from the Supreme Court of Texas in terms of analysis of why it does not conflict with the words and why, in fact, I think it requires simply standing to be correctly applied. Now, again, and again, the Fifth Circuit has not expressly rejected this, and it completely gels with the control test that the Fifth Circuit uses. And- Well, sure. So in the Bloom case, which is Bloom v. Bexar County, Texas, in footnote number two, the Fifth Circuit stated that these cases do not rule out the possibility that a plaintiff may maintain an action against a defendant who is not technically the plaintiff's direct employer. They do establish that the focus of any inquiry must be the element of control. And actually, if you look at the Bloom case, what the court actually says is that Bexar County was not liable under Title VII because it didn't have the ability to interfere in the employment opportunities of the plaintiff in that case. If you go to that page, it says, Bexar County could not have discriminated against Bloom in the manner prescribed because Bexar County did not have control or authority over job application procedures, hiring advancement, or discharge, employee compensation, things like that. So what that means, in my view, is that if there was a case such as where an employer, a Title VII employer, did have that control but was not the direct employer of the plaintiff, Title VII would still- So you run out of time. Let me ask you this. So can you say that the Sibley issue is teed up in this appeal? You sort of walked backwards a bit and said, well, you argued the elements expressly, put a neon light on it, that that's what you were urging below. But you said you marshaled the evidence and you cite to us, okay, we say you don't have to have a talismanic label. But can you say that inescapably this panel, in order to resolve this case, has to pronounce on this Sibley stand or not? Yes, Your Honor. I would say that because we- I mean, my question is, is this issue tangentially here at best versus it's so front and center, given all the other issues you got to deal with, that we must inescapably address fulsomely the applicability of this Sibley standard? Your Honor, I would say if this court found that there was an employment relationship under Burton v. Freescale Semiconductor, it would not have to reach Sibley standing as an alternative grounds to find the Title VII applied to VHS. I would also- All right. Thank you, Your Honor. Go ahead, finish. Go ahead. I would also say that if this court were to find that there was a contractual relationship or that there was Section 1981 interference, this court would not necessarily have to address whether or not Sibley standing existed on these facts or was applicable. All right. All right. Thank you. I appreciate that. All right. You've reserved your rebuttal time, Mr. Walsh. All right. Let's hear from Ms. Stacy. May it please the Court. Good morning. I'm Tiffany Cox Stacy with Ogletree Deacons. I am representing the appellee in this case. Since the appellee's legal name is somewhat long, I will just refer to that entity as North Central Baptist or Baptist. Obviously, you all have read the briefing in this case, and so I will use my time to discussion with Mr. Walsh. With regard to Burton versus Freescale Semiconductor, the parties agree that that is the appropriate standard to apply in determining whether Dr. Perry was an employee or an independent contractor. But when you look at the facts of Burton, they are very different than the facts in this case. In Burton, the individual was employed by a staffing agency at Freescale Semiconductors. The individual's manager with his staffing company was not even on site. There was no interaction. On the other hand, the Freescale managers actually went so far as to conduct performance reviews for the plaintiff, where here at most, Dr. Perry is saying that we counseled him. Freescale also administered on-the-job disciplinary action to the individuals. So that case had a lot more facts than this one does. And not surprising there, it was concluded that Freescale and the staffing company were joint employers. The Sibley Doctrine standing argument, quite frankly, was pretty frustrating when I received appellant's brief. Generally, an appellant's brief should not be a surprise from the summary judgment motion. And the Sibley standing doctrine, more so than anything, is the argument that has been the position from his complaints to his pleadings that he was an employer or that he was an employee of Baptist and that Baptist was a joint employer with PICS. Those are the only allegations made in the complaint. Then when VHS, Baptist, and PICS asked the district court to bifurcate proceedings so that we could focus on these threshold issues of independent contractor status, Dr. Perry opposed that request. And in his response, he recognized that if there was a determination that Dr. Perry was an independent contractor and VHS, Baptist was not an employer, that was dispositive of the Title VII claims. He did not say at that time, oh, but wait, even if I'm not an employee, I still have this claim under the Sibley Doctrine. And then, of course, into his response to the motion for summary judgment, which is what was before the and or his joint employer with PICS, there was absolutely no reference to any sort of alternative argument that his Title VII claim would survive, even if he was an independent contractor. And with all due respect to Mr. Walsh, he is a board certified employment law attorney. You know, I understand there is leniency given when it's a pro se filing, but there was no reason to not articulate those points when it was before the district court. And so I believe it has been waived. I would also like to point out in the Bloom case that Mr. Walsh cited to, the court in that case noted that the Sibley Doctrine had really become questionable at best because of the underlying case law. This court noted that the Sibley case was decided by the D.C. Circuit in 1973, which was prior to the D.C. Circuit adopting the economic realities common law control test, which is what the Fifth Circuit has adopted and which is what was applied by Judge Rodriguez in granting summary judgment. My understanding of all this is that the Bloom case is suggesting that the Sibley standing doctrine isn't really necessary when we apply the hybrid economic realities common law control test. And that's how I understand the analysis in Bloom. And there have been no cases in the Fifth Circuit that have adopted this doctrine, with one exception that was cited to in Mr. Walsh's brief. And he cited to several cases in his brief saying that, hey, this has been accepted by the courts. There's one case out of the Eastern District of Texas where the court said, oh, well, the Fifth Circuit hasn't ruled on it, and so we'll follow it. The other two cases cited to by Mr. Walsh, it's a stretch to say that it was adopted. It was more of, okay, we'll assume this applies, even still, it doesn't matter in the case. It's not dispositive to the case. And so I think that those are things that are worth pointing out. So I want to be sensitive to your frustration and surprise about seeing an argument for the waiver. Are you prepared to talk today about the statutory textual basis for the Sibley Doctrine? Well, I would certainly feel more comfortable to submit supplemental briefing on the issue. In preparing our appellant's brief, I wanted to be cognizant of our page limitations and ensure that I addressed everything that actually was considered by the district court. I have since done an immeasurable amount of research to try to understand the current status of this doctrine. And the case law that I cited to an appellant's brief lends further credence, I suppose, to my thought that Sibley standing really doesn't have a place in our analysis now that we do have this common law right of control economic realities test that we get to the right conclusion using that test. Well, you can certainly understand that I hope that as between the test as you described it in the statutory text that Sibley standing purports to rest on, you can understand that how some courts wouldn't necessarily prefer the latter, or at least to understand the latter before adopting the former. And so, but I, as I say, I want to be sensitive to the fact that this apparently was not briefed in the district court. So I won't consume more of your time with it. Well, one thing that I do think is interesting is one of the cases that we cited too heavily in our briefing is the EEOC versus Valero refining Texas. That case was decided by Judge Greg Costa prior to his appointment to this court. And, you know, he kind of touched upon, I guess, this policy argument of what he described as being independent contractor whole, if you will, that when you look at the text of the statute, it doesn't really cover independent contractors. And what Judge Costa said in that opinion is, you know, the independent contractor whole and federal anti-discrimination law has long been criticized and Congress has yet to enact a fix. So I think that was an instance of judicial conservatism in that, you know, this is a statute from Congress and this is how it reads. And so, yes, we as advocates and as judges may be aware that there is a whole as it relates to independent contractor status, but Congress needs to fix that. And until that point in time, we need to apply the law as it's written. You're still on your light. Yeah, I have more time to talk. Okay. So we didn't really touch upon the Section 1981 claim. The focus of Dr. Perry's argument before Judge Rodriguez was that, yes, there is a contractual agreement between Baptist and Dr. Perry. And he cited to a one-page physician agreement that notably that he signed after applying for medical staff membership and privileges at Baptist and after he executed his agreement with PICS. And the reason that this is significant is that the Exhibit A physician's agreement, it originated out of the contractual agreement between Baptist and PICS. And it was made part of a section related to medical staff membership. All doctors, whether you are an employee doctor or just a doctor with privileges, you have to obtain medical staff membership and clinical privileges to treat patients at Baptist. So in the one-page document, Dr. Perry basically acknowledged, I'm an independent contractor. I will abide by the standard of care by practicing good medicine, and I will abide by the medical staff bylaws. All of those things were already represented to by Dr. Perry when he applied for medical staff membership and privileges. In the bylaws, which are part of the record, in applying for that membership, the applicant is certifying, I have received the bylaws and I agree to comply with them. I also agree to abide by the standard of care and to be in good standing, all of these basic requirements. So that was already agreed to by Dr. Perry when he made his application for his medical staff membership and clinical privileges. He reiterated those agreements when he signed his agreement with PICS. Let me ask you this question. You know, one thing that would concern the judges, I think, about eliminating the right to sue for racial discrimination under 1981 against DSH. They're out in terms of Title VII. The plaintiff is out in terms of Title VII with respect to his actual employee in the clinic. The only thing that is remaining is the 1981 claim against the clinic. Is that correct? Is that still pinned in? Yes. At the district court level, Dr. Perry's lawsuit against PICS is pending with his section 1981 claim. All right. And so if we rule in this case, the case automatically goes back to the district court to try the 1981 case against the clinic. Is the status of the proceedings after we decide this case, if we rule in your favor? Yes, Your Honor. Mr. Walsh requested a stay of the underlying proceedings pending this appeal. All right. Then the other thing that I was wondering about is whether the plaintiff in this case has a state law claim because, you know, you have the common law claim in the state of Texas, interference with contract. And if VHS interfered with the contract that the clinic has for racial reasons, it seems to me that there would be a state claim available to the plaintiff as well. The point of my non-question question is there are other avenues here left for this plaintiff to vindicate such rights as he may have. Is that more or less accurate or am I misstated? I agree with that. And, you know, as is stated in our briefing, it's our contention that Dr. Perry also waived this interference theory under section 1981 before the district court. And in my mind, the fact that he failed to plead a tortious interference claim from the get-go is further indicative of the fact that claim did not arise, if you will, until this appeal. Okay. Let's proceed with your argument. I'm through. Now, good comments and questions. I appreciate it. One thing that I think is very significant in this case is that, yes, Baptist had the right to request removal of a PICS physician if Baptist concluded that that physician could impact quality of care for its patients. And what was added to the agreement between PICS and Baptist was that PICS was only required to comply if consistent with the bylaws. And that's important because the owners and directors of PICS, they were also physicians. They were also maintained medical staff membership and clinical privileges at Baptist and were equally bound by the bylaws, which are part of the record and which include an anti-discrimination provision. So, Dr. Perry seems to suggest that if we don't change the law with regard to Section 1981, that Baptist would just be free to discriminate against physicians, which is not the case, at least not in this particular agreement. The PICS physicians insisted upon that inclusion, meaning that they had to independently decide that Baptist's request was not inconsistent with those bylaws, which not only prohibited discrimination, but also defined the types of conduct that could subject a patient to risk or inferior quality of care. So, I think that that there was not entirely unqualified. I have two minutes left. And the final point that I would like to make is, and I do think it's significant, is the only cases in this circuit that have addressed interference by a third party, they're limited. They have basically been limited to situations where a Section 1981 claim has been brought against an individual also employed by the same employer that employed the plaintiff. And in those cases, the courts recognized that the actions and conduct of the individual employee could be treated essentially the same as the employer. And that's a very different analysis than what we're looking at here. You know, Baptist certainly was not an employee or agent of PICS in making these decisions. Let me ask you a question. Yes, sir. Am I correct in understanding that with respect to Dr. Perry, this was the first and only time VHS had exercised its contractual right to request removal of a PICS physician. In other words, presumably there were others along some continuum of time, but this is the only time, and I'm asking if the record shows this not to go outside the record, but this is the only time that it exercised this authority to terminate a physician. Is that accurate? That's correct, Your Honor. And that is in the record that this is the only time Baptist has felt that the situation was serious enough to request the physician's removal. But yet they terminated him for no cause. Is that not correct? Right. The decision was made simply because this was not a term employment agreement. Rather, it just had a 90-day notice period. And so the decision was made to provide that 90-day notice to Dr. Perry. Dr. Perry continued working. 90-day notice. Was that DSH or was that the clinic? That was a term that was in the agreement between PICS and Dr. Perry. They exercised the right to provide him with the 90-days notice, and he was paid for the entire 90-day period. And he was terminated for no cause. Is that... Yeah, we, you know, I guess as a general, you know, general notion in the employment world that the term for cause or without cause can mean very different things. And so since there was simply a provision that, hey, we only need to give each other 90-days notice, that, you know, that was how it was handled. So the answer is yes? The answer to that is yes? No. Yeah, I mean, I, I mean, I would. This is, yeah. Yeah. Yeah. I just... Just like a witness on the stand, a one-word answer will do. You explained it. So is the answer, so is the answer to just yes? Yes, your honor. And then it seems to me that you all have put your neck in a noose on this case. And if the contract, if the 1981 claim becomes viable, you terminated him for no cause. So, and he comes in and says that race was the reason you terminated me. And he says, was that a pretext? Was, what was your cause? No cause. Well, so... He almost walks away on... I guess I should clarify. There was, we think of cause as somebody embezzled, somebody engaged in a physical altercation. You don't have to explain to me. I'm just... Yeah. In fact, I mean, I'm just ruminating, to tell you the truth. And it seems like to me that the noose was tightened by VHS on the clinic's neck. So, but then that's just the way it appears to me that you may be in a little jam. Well, there was, there were reasons why he, there were multiple complaints being made by both his fellow doctors that were part of the PICS group. I understand that, but I mean, no cause. Anyway. The answer's still yes, right, Ms. Stacey? That's an aside. I'm sorry. All right. I think we'll, unless there are other questions, we're going to leave you at the yes answer, Ms. Stacey. All right. Sounds good. I appreciate your time and attention and questions. Thank you very much. All right. All right. Thank you. We'll pivot back to Mr. Walsh. You got three minutes to cover a lot of ground, so go for it. Thank you, Your Honor. I just have a few points I just want to point out. Regarding Judge Jolly's discussion of a tortious interference claim or something like that might exist even if 1981 was dismissed or a summary judgment was affirmed. I think there could be some potential issues with the tortious interference with contract claim in this particular case. Because first of all, we'd have to show that there was some kind of tort and a race discrimination claim. Even if that's an employment tort, it's a statutory tort. And that's going to require an employer-employee relationship, an employment relationship, in order to show that that was a tort that they violated. Well, you don't have an employment relationship under Title VII, but that, I mean, you may not. My view is that I haven't been convinced that you do. But that doesn't mean you don't have a contractual relationship under 1981. Oh, I agree completely, Your Honor. I think that we do have a contractual relationship under Section 1981. You may not, but that in Title VII certainly does not resolve the 1981 claim. Well, what I meant to say, Your Honor, is that under at least my understanding of Texas law is that an employment tort of race discrimination is common law claims of race discrimination that you might be able to bring. And so you couldn't allege a tortious interference with the contract on the basis of race discrimination unless you also potentially, and I don't even know if you could do this, unless you vet some kind of Chapter 21 of the Texas Human Rights Commission Act requirements for a race discrimination claim. I could be completely wrong on that kind of issue, but I don't know. All that is speculation to tell you the truth, and I started it out being guilty and apologize. I'm sorry, Your Honor. I just tried to address one of those issues. One of the other things that was brought up during Ms. Stacy's argument was this idea of independent contractor status and the Sibley standing or that there's some kind of hole regarding that. And I just want to go back real quickly to the elements of Sibley standing. There's three of them. Title VII employer is the one, an employment relationship with a third party. And then the defendant interfered with that employment relationship or that employment opportunity. So it wouldn't actually cover if Dr. Perry was found to be a completely independent contractor, Sibley standing would not save him. It would not fix this independent contractor hole because of the second element, which requires an employment relationship between the plaintiff and a third party. And that's why it's so significant that Judge Rodriguez in the district court found there was a fact issue regarding whether or not there was an employment relationship between Dr. Perry and PICS. And that's what brings it within Sibley's ambit if it were to be adopted by this court. I would also point out one more thing about Sibley is that in the case Diggs v. Harris Hospital Methodist, which was cited by Bloom as being consistent with their ruling, this court does hold or state that it should be liberally construed, resolving ambiguities in favor of the complainant. And then it emphasizes that even if Sibley standing were to be adopted by the circuit, it would have to deal with an employment relationship that was being interfered with. Again, this is addressing the issue brought up regarding the independent contractor hole discussed by Judge Costa in the Valera decision. All right. You've got a red light, Mr. Walsh, on your claim. So do I understand you've had this claim throughout, not just on appeal, your counsel of record down below through all these pleadings and proceedings and so forth before Judge Rodriguez, you've had your hand on the steering wheel. Is that right? Yes, Your Honor. We have argued the elements of Sibley standing throughout. That was not my question. Listen to my question. Not the one you want to answer. I just asked, do I understand you were counsel of record and you've had your hand on the steering wheel in the handling of the pleadings and the trial below or the proceedings below with Judge Rodriguez? In other words, you're not showing up on appeal with these issues. We can understand that you pick the theories, the cause of action and, you know, handle it. It's not a loaded question. I'm just asking for affirmation. Yes, Your Honor. I was brought on after the complaint was filed, but I've been handling it since then. All right. So the matter of whether or not Sibley is preserved or not is a matter, you know, that was either strategic or whatever. Anyway, not debating. I just want to be clear on my understanding of matters. And second point, you agree with counsel opposite that once our panel finishes this matter, you do have the 1981 claim still parked in neutral down at the district court to pick up with. Is that correct posture where the case is? Yes, against a different party, not against VHS. Right. Well, yeah, I guess. All right. Just wanted to clarify for myself. Judge Oldham, you got a question for him? No, sir. I'm good. All right, Judge Jolly. Anything else for Mr. Walsh? I was just amused by the metaphors that the chief here was using. I'm driving the steering wheel, parking it in neutral. I mean, I was wondering what kind of driver's license you need the way you said all the metaphors chief is using. Well, I just thought rather than ruminating, I would use a metaphor that counsel could identify with. I just wanted to be clear whether he was appellate counsel and he took the record the way he found it and is articulating simply in other matters based on what was there. In other words, he's a substitute driver as opposed to him getting in the vehicle from the start and driving it. And he lives or dies with the choices he made in terms of, you know, which way to drive it. It just was an information question that saved me some time from looking for that. It wasn't meant to be dismissive. We love having the lawyers that handle it down below because, you know, we get the straight answers. That's all. So anyway, as Judge Jolly would say, just a little rumination on my part to parties, but the man simply being raised and whether it's preserved, I didn't mean to make light of it, but that's at least for me a question in terms of whether it was tangentially raised, albeit with the elements, versus was it really presented to the district court to rule on. And you've spent a lot of time, you know, about the standards. So I just wanted to be clear. But having said that, we appreciate the briefing in the matter and the oral argument, especially your responses to our questions. We'll deem the case submitted. We'll get it decided as soon as we can. Thank you to both sides. You're excused. Thank you very much. Y'all stay safe and happy holidays. Same to you. Thank you. Thank you.